## THE RITA.

(District Court, D. South Carolina. October 13, 1898.)

1. DISTRIBUTION OF PRIZE MONEY—CREWS OF AUXILIARY CRUISERS—CONSTRUCTION OF STATUTE.

The third class of vessels enumerated in Rev. St. § 4641, which makes provision for the distribution of prize money, consists of such vessels as are "not of the navy, but controlled by either executive department," and includes such auxiliary vessels as may be chartered by the government. As to this class it is provided that "the whole amount decreed to the captors shall be divided among the ship's company." Section 4631, prescribing the persons entitled to share in such prize money, and the basis of division, after fixing the shares of the commanding officers provides (paragraph 5) that "the residue shall be distributed and apportioned among all others doing duty on board * * * and borne on the books of the ship, in proportion to their respective rates of pay in the service." *Held* that, as applied to the distribution of the proceeds of a prize captured by an auxiliary cruiser, chartered by the government for service in war, to be manned by her regular officers and crew, and to take on board in addition two naval officers and a guard of marines, the "ship's company," within the meaning of section 4641, included not only the marines, but the crew and officers of the vessel, who were "doing duty on board and borne on the books of the ship," and entitled to share in proportion to their rate of pay from the owners of the vessel; the words "in the service" not being limited in their meaning in such case to those in the regular naval service.

2. SAME.

The fact that the crew of an auxiliary cruiser capturing a prize were entitled by their shipping articles to 50 per cent. additional wages from the owners of the vessel for good behavior at the end of the 12-months service for which they shipped does not affect their right to share in the prize money, nor do the facts that some were aliens nor that they subsequently refused to enlist in the navy.

In the Matter of the Distribution of Prize Money.

Coudert Bros., for marine guard.

F. D. McKenney, for officers and crew of Yale.

BRAWLEY, District Judge. This is a question of the distribution of prize money. The Spanish steamship Rita, heretofore condemned as lawful prize of war, was taken for the use of the government, after appraisement, in accordance with section 4624 of the Revised Statutes, and the value thereof, $125,000, is subject to the order of the court in the cause. The cargo, which was also condemned, has been sold after due advertisement, and the proceeds thereof likewise deposited, but, inasmuch as claims of neutrals to some portion thereof are not yet adjudicated, the exact amount for distribution cannot be stated.

It is provided, in section 4630 of the Revised Statutes, that the net proceeds of all property condemned as prize shall, when the prize was of equal or superior force to the vessel making the capture, be decreed to the captors, and when of inferior force one-half shall be decreed

to the United States and the other half to the captors; and section 4631 provides for the distribution of the prize money adjudged to the captors in the proportions therein set forth,—the commander of a single vessel, if acting independently of a superior officer, being entitled to three-twentieths of the prize money awarded, and, in cases where no other vessels of the navy are within signal distance of the vessel making the capture under such circumstances as to be able to render effective aid if required, the fifth subdivision of said section provides that "the residue shall be distributed and proportioned among all others doing duty on board, including the fleet captain, and borne on the books of the ship in proportion to their respective rates of pay in the service."

As the proof shows that the Rita was an unarmed merchant vessel, the captors are entitled to one-half of the prize money, and Capt. W. C. Wise, being in command of the capturing vessel and on independent duty, is entitled to three-twentieths of the amount allowed to the captors. No other vessel being in sight and entitled to share, the only question for determination is as to the distribution of the residue, and this question arises out of the somewhat anomalous character of the capturing vessel. The capture was made May 8, 1898, by the United States cruiser Yale, which prior to April 30, 1898, was known as the "City of Paris." She belonged to the International Navigation Company, and was of the class of steamships which, under the provisions of the act of March 3, 1891, was subject to be taken by the United States as a cruiser or transport, upon payment of her actual value. By a charter party and supplementary agreement entered into April 30, 1898, between the company and the government, acting through the secretary of the navy, possession of the ship was transferred to the government. By it she was heavily armed, and converted into an auxiliary cruiser, and her name changed. The charter party provided that the ship should be "manned, victualled, and supplied at the expense of the charterer," which is also to pay all other expenses whatsoever, and return the same in good repair, less ordinary wear and tear, at the termination of the chartering, which was to be at the will of the charterer. The supplementary agreement provided that the ship was "to be manned by her regular officers and crew, and in addition thereto was to take on board two naval officers, a marine officer, and a guard of thirty marines, and was to be victualled and supplied with two months' provisions, and about four thousand tons of coal; the actual cost to the owner of such additional equipment and services to be reimbursed by the charterer upon bills to be certified by the senior naval officer on board." There were also provisions protecting the owner against all expenses and liability, and a provision that during the continuation of the supplementary agreement the steamship was to be "under the entire control of the senior naval officer on board."

When the Rita was captured the Yale's company consisted of Capt. W. C. Wise and Lieut. Key, both being officers of the United States navy, and a marine guard of 25 men enlisted in the service of the United States, the remaining 269 officers and men doing duty on board and borne on the books of the ship not being commissioned by, or enlisted in, the service of the United States; and the cause is before

me on the petition, by way of intervention, of the sergeant and the marine guard, which claims that the prize money is to be distributed among the regularly enlisted officers and men, and that the officers and crew of the Yale who were not so enlisted are not entitled to share therein.

The constitution of the United States (section 8, par. 11) devolves upon the congress the power to "make rules concerning captures on the land and water"; and the act of March 2, 1799, entitled "An act for the government of the navy of the United States," the first which relates to the subject, provides for the distribution of prize money, the shares of each class of distributees being specifically prescribed. None but ships of war belonging to the United States were in the purview of this act. The next act is that of April 23, 1800, entitled "An act for the better government of the navy of the United States." Both of these acts were obviously framed to embrace only such captures as were made by public vessels of the United States, although the provisions for the division of the prize money between the government and the captors, and the distribution of the latter's moiety, are substantially similar to those found in the Revised Statutes. The act of June 26, 1812, provides for the issuance of letters of marque and reprisal, and for the distribution of the proceeds of all captures in accordance with any written agreement which may exist, and, in the absence of any agreement, one moiety to the owners, and the other moiety to the officers and crew, according to the rules, as nearly as may be, prescribed for the distribution of prize money by the act of April 23, 1800. This act was superseded by the act of January 27, 1813, but no material change was made in the distribution of prize money. The acts of March 3, 1849, and of March 25, 1862, make some changes in the law, mainly of an administrative nature. All of these acts relate to captures by "vessels of the navy," or by privateers, and up to this time no provision is made for distribution of prize money among any other class of captors. The act of July 17, 1862, extends the right to participate in prize money to another class of vessels. It is entitled "An act for the better government of the navy," and the sixth section provides "that any armed vessel in the service of the United States which shall make a capture or assists in a capture, under circumstances which would entitle a vessel of the navy to prize money, shall be entitled to an award of prize money in the same manner as if such vessel belonged to the navy, and such prize money shall be distributed and apportioned in the same manner and under the same rules and regulations as provided for persons in the naval service," etc. It is clear that this act intended to extend the benefits of participation in prize money to vessels not of the navy nor privateers, and vessels of the class of the Yale temporarily in the service were covered by it; yet section 3, which provides for the distribution of the prize money, is in words almost identical with those found in the Revised Statutes, the third paragraph being as follows: "Third. The share of the commanding officer of the fleet or squadron, if any, and the share of the commander of the ship being deducted, the residue shall be distributed and apportioned among all others doing duty on board and borne upon the books, according to their respective rates of pay in the service."

As the contention on the part of the marine guard is that the non-enlisted officers and men of the Yale are not entitled to participate in the prize money because they are not "in the service," it is not without significance that the phrase, "according to their respective rates of pay in the service," appears for the first time in our statutes in the act of 1862, which for the first time extended, to others than those in the regular naval establishment or privateers, the benefits of sharing in prize money; and, if this phrase is to be interpreted as claimed, it would nullify the privileges manifestly intended to be conferred by section 6 of that act.

There is nothing in the act of March 3, 1863, of any significance as to the point involved, and the next act is that of June 30, 1864, which is entitled "An act to regulate prize proceedings and the distribution of prize money and for other purposes." This act, with but slight changes in the arrangement, forms the body of the Revised Statutes on the subject of "Prize." It repeals section 6 of the act of 1862, re-enacts in almost identical words the third paragraph of section 3 before cited, and provides, in section 16, which is now section 4641 of the Revised Statutes, for the distribution of prize money among three classes of captors. In the first class are "vessels of the navy." These are defined by section 4614 to be "all armed vessels officered and manned by the United States and under the control of the department of the navy," and such as are referred to in the acts of 1799 and 1800. In the second class are vessels "not of the navy and not controlled by any department of the government." This is the class brought in by the act of 1812,—vessels sailing under letters of marque and reprisal. The third class is of vessels "not of the navy, but controlled by either executive department." Obviously, this class includes those brought in by the act of 1862,—"any armed vessel in the service of the United States," not vessels of the navy or privateers; such vessels as any department of the government may, to meet a temporary exigency, bring into its service, such as the act of 1862 declared "entitled to an award of prize money in the same manner as if such vessel belonged to the navy"; such, manifestly, as was the Yale. In all cases falling under this class, the statute prescribes that "the whole amount decreed to the captors shall be divided among the ship's company."

It is a settled canon of construction that courts are bound to give effect to every word in a statute whenever it is possible to do so. The granting words here are to the "ship's company,"—not to the official part of it, if it so happens that some are in the regular service of the government, and some are only temporarily in that service, but to the whole of the ship's company.

In the distribution among the "ship's company," the fifth paragraph of section 4631 becomes operative, and "all doing duty on board and borne upon the books of the ship" must share "in proportion to their respective rates of pay in the service." The proctor for the marine guard asks the court to construe the words "in the service" to mean in the regular naval service. That the words may be, and often are, used in this technical sense is true, but these words do not necessarily mean anything more than that the distribution should be limited to those serving aboard the ship. "Service," etymologically, is the act of serving in any sense; the rendering of duty to another or the per-

formance of labor for another. Hence we have the diplomatic service, the consular service, the civil service, and the military and naval service. Considered in its historical relation to the subject of this inquiry, we find the phrase first used in the act of 1862, where it is plain that it was not the intent of the lawmaker to limit its meaning to those who were in the regular naval establishment. Nor is there anything, in the nature and reason of things, that requires or justifies such a narrow, strict interpretation of it. What service did this marine guard render in and about the capture of the Rita that should exalt it above others of the ship's company? It braved no danger that was not common to all. Whatever there was of skill or merit in the running down of an unarmed merchantman was shared alike by all, or, if there was occasion for the exercise of any peculiar skill, it would rather lie with those charged with the navigation of the Yale than with the marines, who were simply soldiers serving aboard ship. The common expression, "Tell that to the marines," is supposed to have had its origin in their ignorance of seamanship.

There being nothing in the etymology of the words, or in their historical use, in connection with this subject, or in the nature of the service rendered, which would sustain the discrimination claimed, we will next consider the authority cited in support of it. The Merrimac, 17 Fed. Cas. 121, is quoted as being "decisive and directly in point." There may be some occult force in this decision not discernible by the ordinary apprehension. It does not seem to me to have any bearing whatsoever upon the question. The Merrimac was captured off Wilmington, N. C., by the United States gunboat Iroquois, and condemned as prize of war. The merchant steamer Eagle, which had no commission from the government, claimed a share of the prize money, on the ground that she had interfered actively and serviceably in intercepting and delaying the captured ship, and had thus assisted in the capture. All that was decided in that case was that a merchant vessel not in the service of the government, and having no commission therefrom, is not entitled to share in the proceeds of a prize, although present at and co-operating in the capture; the decision resting upon the ground that the statute prescribes that the public ships and armed vessels in the service of the United States are exclusively entitled to share in the distribution of prize money. The learned proctor for the marine guard has also misapprehended the facts in saying that the officers and crew of the Yale are "not borne upon the books of the ship making the prize." Capt. Wise in his report of the capture to the secretary of the navy, of date May 8, 1898, says: "I have the honor to submit the accompanying list of officers and men then serving on board this vessel, with a certified statement of their monthly pay, and request that each may be allowed his full share of prize money as determined by the statute laws of the United States." This includes all of the officers and men who were doing duty aboard the Yale at the time of the capture.

In one aspect of the case, this letter of Capt. Wise might be of some persuasive force, as indicating those who, on the ground of meritorious service, would be entitled to a share of the prize money; and so would be considered the letter of the secretary of the navy of date June 13, 1898, wherein the proctors of the civilian officers and men

are advised that the department of the navy is not inclined to antagonize any steps which may be taken to secure to their clients the same rewards which would accrue to them under the statutes regulating the distribution of prize money had they formally entered the naval service. The evidence fully establishes the fact that the petitioner Watkins and others of the crew of the City of Paris, mentioned in his petition, although not formally enlisted, were "doing duty on board and borne upon the books." They were charged with the navigation of the ship. There was no other crew on board capable of performing that service. From them was selected the prize master and crew which brought the Rita into port for condemnation. If they were not "in the service" of the government while performing that mission, they incurred the hazard of being considered as pirates.

Although the law is well settled in this country that all captures juri belli belong to the government, to which inures all the droits of admiralty, and that captors can only claim as of right through its grant, yet cases are not few where prize money has been awarded to noncommissioned vessels and captors not embraced in any statute. Such was The Dos Hermanos, 2 Wheat. 77, 10 Wheat. 310, where an award of one-half of the prize proceeds by the district court was sustained in the supreme court as being "in the nature of salvage for bringing in and preserving the property." And Atty. Gen. Wirt (1 Ops. Attys. Gen. 463), says it has been the "constant practice" of this government to reward the gratuitous enterprise of such noncommissioned individuals by awarding them a part, and sometimes the whole, of the prize. It is the recognition of such practice that doubtless led the secretary of the navy to say, in the letter already cited, that the department was "disposed to consider in a liberal spirit the equitable features of such a case." Chief Justice Marshall in The Dos Hermanos says that the award in that case "was an exercise of sound discretion."

If it were necessary to invoke "equitable" principles, I would hold that all of the ship's company, being engaged in a common enterprise, contributing each according to his capacity to the success of it, and sharing a common danger, should share alike in the reward; but it seems to me that, by fair interpretation of the statute, all of the ship's company doing duty on board and borne upon the books are entitled as of right to share in the prize money in proportion to their pay, and a decree will be entered accordingly.

I have considered the suggestion of the proctor for the marine guard that, inasmuch as by the shipping articles the international navigation company agreed to pay its employés 50 per cent. additional wages for good behavior at the expiration of the 12 months for which the crew was shipped, such agreement should be considered as in lieu of prize money. It does not so state, and as this bonus can only be claimed after a year of good behavior, and many may not live to realize it, I do not feel that rights under the law can be affected by it; and still less weight is to be given to the suggestion that some of the crew are aliens, and refused to enlist in the service of the government when opportunity was given, a few months after the capture of the Rita. Whatever their rights may be, they accrued as of the date of the capture, and cannot be affected by events subsequent thereto.